1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11   UNITED STATES OF AMERICA,        No. 2:07-cr-00266 FCD DAD

12              Plaintiff,
                                      MEMORANDUM & ORDER[1]
13         v.

14   HARRISON U. JACK, et al.,

15              Defendants.

16   _____

17                          ----oo0oo----

18        This matter is before the court on the motions of defendants

19   Harrison Ulrich Jack, Lo Cha Thao, Lo Thao, Hue Vang, Chong Yang

20   Thao, Seng Vue, Chue Lo, Nhia Kao Vang, David Vang, Jerry Yang,

21   and Thomas Yang (collectively, "defendants") to dismiss counts

22   from the Second Superseding Indictment.  The United States of

23   America (the "government") opposes the motions.  The court heard

24   oral argument on the motions on October 15, 2010.  Based upon the

25   submissions of the parties and the arguments made by counsel, and

26

27   _____

28        [1]    The court has redacted portions of the Memorandum &
     Order that refer to grand jury testimony filed under seal.

for the reasons set forth below, defendants' motions to dismiss are GRANTED in part and DENIED in part.

**BACKGROUND**

**A.   Procedural History**

This investigation began on or about September 26, 2006, when defendant Harrison Ulrich Jack ("Harrison Jack") allegedly spoke with a third-party regarding the purchase of 500 AK-47 machine guns.  (Second Superseding Indictment [Docket #578], filed June 24, 2010, ¶ 24a.)  Subsequently, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began an undercover investigation which lasted until June 2007.  (Id. ¶ 24b-nn.)

On June 14, 2007, eleven defendants, Harrison Ulrich Jack, General Vang Pao, Lo Cha Thao, Lo Thao, Youa True Vang, Hue Vang, Chong Yang Thao, Seng Vue, Chue Lo, Nhia Kao Vang, and David Vang, were charged with counts arising from an alleged conspiracy to overthrow the government of Laos.  (Second Superseding Indictment [Docket #37], filed June 14, 2007.)  All defendants were charged with (1) Conspiracy to Violate the Neutrality Act in violation of 18 U.S.C. §§ 371 and 960; (2) Conspiracy to Kill, Kidnap, Maim and Injure People in a Foreign Country in violation of 18 U.S.C. § 956; (3) Conspiracy to Receive and Possess Firearms and Destructive Devices in violation of 18 U.S.C. § 371, 18 U.S.C § 922(o), and 26 U.S.C. § 5861; and (4) Conspiracy to Export Listed Defense Items Without a State Department License in violation of 18 U.S.C. § 371 and 22 U.S.C § 2778.  Nine of the eleven defendants, Harrison Ulrich Jack, General Vang Pao, Lo Cha Thao, Lo Thao, Youa True Vang, Hue Vang, Chong Yang Thao, Nhia

2

Kao Vang, and David Vang, were charged with a Conspiracy to
Receive and Possess Missile Systems Designed to Destroy Aircraft
in violation of 18 U.S.C. § 2332g.

On September 17, 2009, the grand jury returned the First
Superseding Indictment.  (First Superseding Indictment [Docket
#460], filed Sept. 17, 2009.)  The First Superseding Indictment
combined Counts One, Four and Five from the original Indictment
into Count One.  It also added a new charge as Count Four:
Conspiracy to Receive and Transport Explosives in Interstate and
Foreign Commerce in violation of 18 U.S.C §§ 844 (d), (n), and as
Count Five: Violation of the Neutrality Act, 18 U.S.C. § 960.
The First Superseding Indictment also charged two new defendants,
Jerry Yang and Thomas Yang.

The First Superseding Indictment did not charge General Vang
Pao.  Rather, on September 18, 2009, the government moved to
dismiss the counts in the original Indictment against defendant
General Vang Pao, asserting that "based on the totality of the
evidence in the case and the circumstances regarding defendant
Vang Pao, . . . the continued prosecution of defendant Vang Pao
is no longer warranted."  (Gov't Mot. to Dismiss [Docket #462],
filed Sept. 18, 2009.)  The court granted the motion on the same
day.

On June 24, 2010 the Second Superseding Indictment charged
the same twelve defendants from the First Superseding Indictment
with the same five counts.  However, just prior to the October
15, 2010 hearing on defendants' pretrial motions, defendant
Colonel Youa True Vang agreed to a brief diversion program

offered by the government, which will likely result in the
dismissal of all charges against him.

**B.   Allegations in the Second Superseding Indictment**

The Second Superseding Indictment charges defendants
Harrison Ulrich Jack, Lo Cha Thao, Lo Thao, Youa True Vang,[2] Hue
Vang, Chong Yang Thao, Seng Vue, Chue Lo, Nhia Kao Vang David
Vang, Jerry Yang, and Thomas Yang with (1) Count One: Conspiracy
to Violate 18 U.S.C. § 960, 18 U.S.C. § 922(o), 26 U.S.C. § 5861,
and 22 U.S.C. § 2778; (2) Count Two: Violation of 18 U.S.C. §
956; (3) Count Four: Violation of 18 U.S.C. §§ 844(d),(n); and
(4) Count Five: Violation of 18 U.S.C. § 960.   The Second
Superseding Indictment also charges defendants Harrison Ulrich
Jack, Lo Cha Thao, Lo Thao, Youa True Vang, Hue Vang, Chong Yang
Thao, Chue Lo, Nhia Kao Vang, and Jerry Vang with Count Three:
Violation of 18 U.S.C. § 2332g.

Count One of the Second Superseding Indictment alleges that
no later than on or about September 29, 2006, and continuing
until on or about June 4, 2007, defendants conspired, *inter alia*,
to knowingly begin, provide a means for, prepare means for,
furnish the money for, and take part in, a military expedition
and enterprise to be carried on from the United States against
the territory and dominion of the foreign nation of Laos, with
which the United States was at peace.   (Second Superseding
Indictment ¶ 21a.)   The Second Superseding Indictment further
alleges that defendants knowingly received and possessed

---

[2]     As set forth above, the government allowed defendant
Colonel Youa True Vang to enter into a diversion program, which
will result in dismissal of the charges against him.

firearms, including AK-47 machine guns, M-16A1 and M-16A2 machine
guns, LAW anti-tank rockets, AT-4 anti-tank projectiles, and
Claymore anti-personnel mines. (Id. ¶¶ 21b-f.)

Under the "Manner and Means" section, the Second Superseding
Indictment alleges that during formal and informal meetings and
conversations between various defendants they "discussed the
acquisition and transfer of military arms. . . from the United
States to Insurgents in Laos to conduct armed operations against
the government of Laos and to attempt to overthrow the government
of Loas." (Second Superseding Indictment ¶ 23a.) It alleges
that "sometimes" defendants used the established Hmong tribal
clan structure and/or various Lao liberation movements in
furtherance of the conspiracy. (Id. ¶ 23b.) It also alleges
that defendants participated in fund-raising activities in
furtherance of the conspiracy. (Second Superseding Indictment ¶
23b-c). The Second Superseding Indictment further alleges that
defendants communicated and coordinated with a military force of
insurgent troops within Laos, (id. ¶ 23e), and that defendants
engaged in the procurement of military arms and negotiated the
purchase of military arms, ammunition, and material from the
United States to be delivered to the insurgent military operation
in Laos via Thailand. (Second Superseding Indictment ¶¶ 23f,
23h, 23k.)

Under the "Overt Acts" section, the Second Superseding
Indictment recounts approximately 38 instances of communication
by or among the various defendants regarding the alleged
conspiracies. (Id. ¶ 24.) Approximately 18 of these
communications included or were directed to the undercover agent.

(<u>Id.</u>)  The Second Superseding Indictment alleges that various combinations of defendants were present at weapons "flashes," where firearms, explosives, and ammunition were shown by the undercover agent, on February 7, 2007, April 18, 2007, and April 24, 2007. (<u>Id.</u> ¶¶ 24d, 24p, 24q.)  The Second Superseding Indictment also alleges that some defendants came up with an operations plan to fulfill the objectives of the conspiracies. (<u>See</u> <u>id.</u> ¶¶ 24f, 24r, 24jj, 24ll.)  The Second Superseding Indictment also recounts various monetary contributions to Hmong organizations, (<u>Id.</u> ¶ 24m), and wire transfers from individual defendants to other known conspirators/defendants in Thailand, (<u>Id.</u> ¶¶ 24cc, 24ee, 24ii.)

Counts Two, Three, and Four of the Second Superseding Indictment incorporate the preliminary allegations, as well as the Manner and Means and Overt Act allegations set forth in Count One.  Count Five, incorporates the preliminary allegations and the Overt Act allegations set forth in Count One.

**ANALYSIS**

At the outset, the court notes the extraordinary nature of this case, with respect to both the complexity of the charges against defendants and the proceedings before the court.  At every hearing in this matter, there have been serious allegations made, not only by the government against defendants, but also by defense counsel against the government.

Co-lead counsel for defendants has been John Keker and James Brosnahan, two of the most notable criminal defense attorneys in

the United States.   Both attorneys practice in two major law firms, which have considerable resources.[3]

Mr. Keker represented General Vang Pao, who was portrayed by the government as the leader of the Hmong people and the leader of the alleged military enterprise.   Mr. Keker is no longer co-lead counsel because the government dismissed the counts in the original Indictment against General Vang Pao.

After General Vang Pao was dismissed, Mr. Brosnahan assumed the role of lead counsel.   Mr. Brosnahan represented Colonel Youa True Vang, ███████████████████████████████████████ ███████████████████████████████████████ who was the only senior Hmong military officer among the remaining defendants.   However, Colonel Youa True Vang agreed to a diversion program, which will lead to the dismissal of the charges against him.   As a result, Mr. Brosnahan no longer serves as lead counsel.

The remaining defendants are represented by court appointed local counsel with the exception of one, who has retained a local sole practitioner.   Aside from the Federal Defender, virtually all defense counsel are sole practitioners with limited resources.   (See Tr. of Hr'g, Oct. 15, 2010, at 26:20-24.)

The prosecutors involved in this case have continually changed.   The prosecutors who directed the investigation and acted as the initial lead counsel are, for reasons unrelated to this case, no longer representing the government.   Subsequently, Assistant United States Attorneys ("AUSA") Robert Tice-Raskin and

---

[3]     Indeed, Mr. Brosnahan and other members of his firm are the authors of eight of the eleven pre-trial motions filed on behalf of all defendants.

Jill Thomas appeared as the lead prosecutors.  More recently, in addition to the AUSAs, Robert Wallace and Heather M. Schmidt, trial attorneys from the National Security Division of the Department of Justice in Washington, D.C., appeared on behalf of the government.

The original Indictment was filed more than three years ago, on June 14, 2007.  The First Superseding Indictment, which added two new defendants, was filed more than two years later on September 17, 2009.  And finally, after eleven pre-trial motions were filed by defendants, a Second Superseding Indictment was filed less than four months ago on June 24, 2010.  Given these series of events and developments, this criminal prosecution can best be described as both uneven and evolving.[4]  It is against this background that the court undertakes its analysis of the first pretrial motions to be resolved in this matter.

## A.    Sufficiency of the Allegations

All defendants move to dismiss Counts One, Four, and Five of the Second Superseding Indictment on the grounds that the government has not pled sufficient facts to set forth the elements of the crimes charged or to put each defendant on notice of the specific offense with which he is charged.

The Sixth Amendment to the Constitution requires that a defendant "be informed of the nature and cause of the accusation."  "An indictment must provide the defendant with a description of the charges against him in sufficient detail to

---

[4]    In light of the court's unusual reference to specific attorneys, the court wishes to make clear that it has great respect for the abilities and integrity of all counsel involved in this action.

enable him to prepare his defense and plead double jeopardy at a later prosecution." United States v. Lane, 765 F.2d 1376, 1380 (9th Cir. 1985) (citing Hamling v. United States, 418 U.S. 87, 117 (1974)); Russell v. United States, 369 U.S. 749, 763-64 (1962) (holding that the sufficiency of an indictment is measured by "first, whether the indictment contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extend he may plead a former acquittal or conviction.") (internal quotations omitted).  The Ninth Circuit has also noted that "[t]wo corollary purposes of an indictment are to ensure that the defendant is being prosecuted on the basis of facts presented to the grand jury and to allow the court to determine the sufficiency of the indictment."  Id.

In order to serve these purposes, an indictment must "allege the elements of the offense charged and the facts which inform the defendant of the specific offense with which he is charged." Id. (citing Russell v. United States, 369 U.S. 749, 763 (1962); United States v. Bohonus, 628 F.2d 1167, 1173 (9th Cir. 1980)). Accordingly, the Ninth Circuit has expressly held that in order to withstand a motion to dismiss, an indictment must allege each element of the charged offense with sufficient detail

> (1) to enable the defendant to prepare his defense; (2) to ensure him that he is being prosecuted on the basis of the facts presented to the grand jury; (3) to enable him to plead double jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge.

9

United States v. Bernhardt, 840 F.2d 1441, 1445 (9th Cir. 1988) (citing United States v. Jenkins, 785 F.2d 1387, 1392 (9th Cir. 1986)).

"In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment." United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002). The court must accept the allegations in the indictment as true in determining whether a cognizable offense has been charged. Id. "A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence. . . . The [c]ourt should not consider evidence not appearing on the face of the indictment." United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996) (quoting United States v. Marra, 481 F.2d 1196, 1199-1200 (6th Cir. 1973)).

### 1.   Count Five:   18 U.S.C. § 960 - Violation of the Neutrality Act[5]

Defendants move to dismiss Count Five on the basis that the allegations fail to set forth a violation of the Neutrality Act (the "Act"), 18 U.S.C. § 960. The government asserts that the Second Superseding Indictment sufficiently alleges that a military expedition or enterprise was to be carried on from the United States.

The Neutrality Act provides:

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from

---

[5]   Because Count Five charges the substantive offense underlying one of the conspiracies charged in Count One, the court addresses this count first.

thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 960. "Neutrality . . . consists in abstinence from any participation in a public, private, or civil war, and in impartiality of conduct towards both parties." United States v. The Three Friends, 166 U.S. 1, 52 (1897). The purpose of the Act is "to secure neutrality in wars between two other nations, or between contending parties recognized as belligerents, but its operation is not necessarily dependent on the existence of such state of belligerency." Wiborg v. United States, 163 U.S. 632, 647 (1896). Indeed, "as mere matter of municipal administration, no nation can permit unauthorized acts of war within its territory in infraction of its sovereignty, while good faith towards friendly nations requires their prevention." The Three Friends, 166 U.S. at 52.[6]

"There are four acts declared to be unlawful, and which are prohibited by the statute: To begin an expedition, to set on foot an expedition, to provide the means of an enterprise, and, lastly, to procure those means." United States v. Lumsden, 26 F. Cas. 1013, 1015 (S.D. Ohio 1856) (internal quotations omitted). Accordingly, in order to set forth a violation of the Act, the Second Superseding Indictment must allege the existence of a

---

[6]     The Neutrality Act was recommended to Congress by President George Washington in his annual address on December 3, 1793, drafted by Alexander Hamilton, and passed the Senate by the casting vote of Vice President John Adams.  The Three Friends, 166 U.S. at 52-53.  It was enacted "in order to provide a comprehensive code in prevention of acts by individuals within our jurisdiction inconsistent with our own authority, as well as hostile to friendly powers." Id. at 53.

military expedition or enterprise that is to be carried on from
the United States.

The Supreme Court has held that the ordinary meaning to be
accorded the term "military expedition" is "a journey or voyage
by a company or body of persons, having the position or character
of soldiers, for a specific warlike purpose; also the body and
its outfit." Wiborg, 163 U.S. at 650.  The term "soldier" is
defined as "a person engaged in military service. . . as a member
of an organized body of combatants." WEBSTER'S THIRD NEW INT'L
DICTIONARY UNABRIDGED 2168 (1993).  "The word expedition is used to
signify a march or voyage with martial or hostile intentions."
Lumsden, 26 F. Cas. at 1015.

The term "enterprise" gives a "slightly wider scope to the
statute." Id.  "[A] military enterprise is a martial undertaking
involving the idea of a bold arduous, and hazardous attempt."
Id.  Such an enterprise exists "where a number of men, whether
few or many, combine and band themselves together, and thereby
organize themselves into a body, within the limits of the United
States, with a common intent or purpose on their part at the time
to proceed in a body to foreign territory . . . ." United States
v. Murphy, 84 F. 609, 614 (D. Del. 1898).  At bottom, such
individuals must demonstrate "concert of action" in order to
constitute a military enterprise. Wiborg, 163 U.S. at 652;
Murphy, 84 F. at 613.

The organization of a military enterprise need not be
completed or perfected within the United States; rather, "[i]t is
sufficient that the military enterprise shall be begun or set on
foot within the United States" or that by previous arrangement or

12

agreement, individuals "meet at a designated point either on the high seas or within the limits of the United States." Murphy, 84 F. at 614; see Wiborg, 163 U.S. at 653-54 ("It is sufficient that they shall have combined and organized here to go there and make war on a foreign government, and to have provided themselves with the means of doing so."). In Gandara v. United States, the Ninth Circuit held that there was sufficient evidence to support a conviction of violating the Neutrality Act where the defendant had furnished arms and ammunition to the Yaqui Indians in Arizona to be used in the operations against the Mexican government. 33 F.2d 394. The court concluded that it was "clear that the enterprise or expedition was to be carried on from Tucson, Ariz., against the Mexican government for the reason that the Yaqui Indians, in leaving the territory of Mexico, ipso facto abandoned their operations against the Mexican government and could only resume them after the return with means to be obtained in the state of Arizona." Id. at 395.

However, the Court has distinguished the purchase and "transportation of arms, ammunition, and munitions of war from this country to another foreign country" from the conduct proscribed by the Act. Wiborg, 163 U.S. at 652. In United States v. Trumbull, the court concluded that there was insufficient evidence to support a violation of the Act even though the defendants had purchased 5,000 rifles and 2,000,000 cartridges in New York with the intention and purpose of sending them to Chili to overthrow the government. 48 F. 99, 101 (S.D. Cal. 1891). In Trumbull, one of the defendants was sent to New York for the purpose of purchasing arms and ammunition, which

1   were shipped by rail to San Francisco and accompanied by the

2   other defendant.   Id.   Both defendants caused the arms and

3   ammunition to be carried by schooner to an area near Catalina

4   Island, where it was to meet with a merchant vessel that would

5   transport the weapons to Chili.   Id. at 102.   The court concluded

6   that the purchase and transportation of weapons in the United

7   States did not suffice to support a violation of the Neutrality

8   Act because "[t]he very terms of that statute imply that the

9   military expeditions or enterprises thereby prohibited are such

10  as originate within the limits of the United States, and are to

11  be carried on from this country."   Id. at 103.   The court further

12  concluded that, despite any purchase or transportation of arms

13  and ammunition in the United States, if there was a military

14  expedition or enterprise, "it was begun, set on foot, provided

15  and prepared for in Chili, and was to be carried on from Chili,

16  and not from the United States."   Id.

17      Moreover, the inception of a military expedition or

18  enterprise "requires something beyond a mere declaration of an

19  intention to do it."   Lumsden, 26 F. Cas. at 1015 (listing as

20  examples "[t]he actual enlistment or enrollment of men" or "a

21  previously concerted movement or arrangement, with a distinct

22  reference to the recruitment of men").   In Lumsden, the

23  defendants were all members of the Irish Emigrant Aid Association

24  of Ohio, which adopted a platform that included "strong

25  expressions of hostility to England" and expressed "a desire to

26  liberate Ireland from her power."   Id. at 1016.   The platform

27  also included a resolution recommending "a convention be held in

28  New York for the purpose of carrying out a united system of

action throughout the Union and the colonies, and to adopt an
address to our brethen in Ireland exhorting them to be of good
cheer, for their friends in America are up and doing, and that
they shall not be left alone in the struggle." Id. The court
concluded that there was insufficient evidence to support a
violation of the Neutrality Act where the alleged military
organization affiliated with the Emigrant Aid Society "was never
perfected" and there was no evidence "that the purpose of getting
it up was an expedition against Ireland." Id. at 1017-18. The
court further noted that although "there was a good deal of talk
about raising money and procuring arms, [] nothing was ever
accomplished in regard to those objects." Id. at 1018. Further,
the court held that mere offer to subscribe $1,000 to a fund in
aid of those "laboring for the independence of Ireland" was
insufficient. Id. Finally, the court emphasized,

> That inquiry is not whether these defendants harbor
> feelings of deep-rooted hostility to England, and a too
> ardent desire for the redress of the alleged wrongs of
> Ireland - not whether, as the result of the almost
> proverbial warmth and excitability of the Irish
> temperament, they have been imprudent, or indiscreet in
> words or actions - not whether their efforts to excite
> the zeal of their countrymen in the United States may
> or may not, in its results and developments, prove
> beneficial to the land of their birth - but whether,
> from the evidence, there is reasonable ground for the
> conclusion, that they are guilty of the specific
> charges against them, or of any other criminal
> violation of law.

Id. at 1019.

In this case, the Second Superseding Indictment charges
eleven defendants with violating the Neutrality Act. However,
the court finds that the allegations in the Second Superseding
Indictment fail to put each defendant on notice of the nature of

15

1    charges against him in order to allow him to prepare a defense or
2    to ensure he is being prosecuted on the basis of the facts
3    presented to the grand jury.

4         As an initial matter, the nature of the military enterprise
5    or expedition alleged is unclear.  Indeed, the lack of clarity in
6    the Second Superseding Indictment is evidenced by the
7    government's changing depiction of the leadership and composition
8    of the alleged military enterprise.  At the bail hearing, the
9    government contended that the military enterprise was led by
10   General Vang Pao.  (See Tr. of Mot. for Bail Review, July 12,
11   2007, at 58:8-11; 63:4-6 ("That sounds much more to me like
12   General Vang Pao exercising commands and saying: This is your
13   mission.  You've been entrusted with this mission.  If you don't
14   accomplish this mission, there's going to be a problem.").)
15   However, General Vang Pao was dismissed from this case when the
16   First Superseding Indictment was filed.  ███████████████████
17   ████████████████████████████████████████████████
18   ███████████████████████████████████████████████████████
19   ██████████████████████████████████████████████████████
20   ██████████████████████████    Also, as noted above, Colonel
21   ────────────────────
22   [7]           ███████████████████████████████
23   ███  █████████████████████████████████████
24        ████████████████████████████████████
25   ███     ████
26   ███  ████████████████████████████████████████
27        ████████████████████████████
28   ███     █████████

                                16

Youa True Vang is the only identified high-ranking Hmong military officer among the remaining defendants; he has agreed to the government's diversion program, which will lead to dismissal of the charges against him.

At the hearing on defendants' motions, the government newly asserted that defendant Lo Cha Thao was now the "leader" of the military enterprise in the United States.[8] (Tr. of Hr'g, Oct. 15, 2010, at 17:11-15; 19:21-23; 20:3-13.) Defendants represented that this was the first time they were apprised of this theory of the composition of the alleged military enterprise. (Id. at 29:7-23.) Also during oral argument, the government pointed to the allegations in the Second Superseding Indictment that referenced the establishment of the "Hmong Homeland Supreme Council." (Id. at 33:5-9; see Second Superseding Indictment ¶ 24m.) However, according to the allegations in the Second Superseding Indictment, this council was comprised of only five of the named defendants. (Id.)[9]



[8]

[9]     Paragraph 24m of the Second Superseding Indictment provides, "On or about April 13, 2005, . . .defendant Harrison JACK, Jerry YANG, Thomas YANG, Nhia Kao VANG, [and] Lo Cha THAO .

Finally, in its supplemental opposition, filed after the hearing, the government asserts that the relevant military enterprise and expedition was comprised of "the insurgents in Laos." (Gov't Supp. Opp'n, filed Oct. 25, 2010, at 6-7.)[10]  While the court agrees with the government that the alleged military enterprise or expedition need not be formal, practical, or successful, a *sine qua non* of such a violation is the existence of an identifiable military enterprise or expedition.  See Wiborg, 163 U.S. at 650 (defining "military" as "having the position or character of soldiers, for a specific warlike purpose"). Therefore, in order to apprise each defendant of the charges against him, the government must allege with sufficient definiteness what, in fact, was the identifiable military enterprise or expedition.  The Second Superseding Indictment fails to do so.

Moreover, the Second Superseding Indictment fails to apprise each defendant of the *specific conduct* he engaged in that allegedly violates the Act.  As set forth above, there are four acts expressly proscribed by the statute.  The Second Superseding Indictment fails to apprise each defendant of what specific theory the government is pursuing against him.  For example, in its original opposition to defendants' motion to dismiss, the government underscored that the "military expedition or

---

. . . met and established and/or became members of the Hmong Homeland Supreme Council . . . ."

[10]   While not the subject of this motion, as noted above, the court is troubled that at each appearance before it, the government has time after time asserted a different hierarchy of the military enterprise and the evolving theory of its operation.

enterprise began and was to be carried on from the United
States." (Gov't Opp'n [Docket #601], filed Aug. 6, 2010, at 2.)
However, in its supplemental opposition, the government
emphasized that the Neutrality Act is violated by "providing or
preparing means" for a military enterprise or expedition. (Gov't
Supp. Opp'n ("Of great importance to this prosecution, the
statute not only criminalizes the commencement of military
expedition, it also criminalizes 'providing or preparing means'
for the same.").)  Importantly, though, in neither the Second
Superseding Indictment, nor the opposition, nor the supplemental
opposition, does the government point to what each defendant
actually did to commit a violation of the Neutrality Act.  In
particular, it is unclear whether a defendant is charged with
"providing or preparing the means" for a military
enterprise/expedition or whether a defendant is charged with
"setting afoot" a military enterprise/expedition.

This ambiguity is exacerbated by the lack of an identifiable
military enterprise or expedition.  Because it is unclear what
constituted the military enterprise or expedition, it is also
unclear whether a defendant's conduct was directed to beginning
the military expedition or enterprise in the United States or
whether such conduct prepared or provided a means for a military
enterprise or expedition elsewhere.[11]  In the absence of
allegations identifying the relevant military enterprise or
expedition, and in the absence of factual allegations that notify

---

[11]   To the extent the government's theory is based upon the
commencement of a military enterprise or expedition in the United
States, the Second Superseding Indictment fails to allege facts
that support "concert of action."  See Wiborg, 163 U.S. at 652.

each of the eleven defendants for what conduct they are being charged, the individual defendants are unable to either prepare a defense or ensure that they are being prosecuted on the basis of the facts presented to the grand jury.

Indeed, the government's incorporation of the overt acts enumerated in Count One's conspiracy charge underscores the lack of notice to each individual defendant.  Unlike a conspiracy charge, the acts of one defendant cannot be attributed to establish the guilt of another for a substantive violation of the Neutrality Act.  Accordingly, the broad references to defendants generally or to specific acts of individual named defendants is insufficient to support a violation by each of the eleven remaining defendants.

Finally, the incorporation of the overt acts to support a substantive violation of the Neutrality Act by each defendant improperly conflates the conspiracy charge with the substantive violation.[12]  As set forth above, the Neutrality Act requires more than the expression of "feelings of deep-rooted hostility," more than imprudence or indiscretion in words or actions, and more than an effort "to excite the zeal of their countrymen." Lumsden, 26 F. Cas. at 1019.  Significantly, the Act requires more than the attempted purchase or transportation of arms and ammunition to a foreign country.   See Wiborg, 163 U.S. at 652.

---

[12]    In reaching this conclusion, the court does not hold that such incorporation is always improper.  Rather, the court holds that under the unique and complicated circumstances of this case, which involves novel charges, multiple defendants, and ambiguities created by the successive indictments, including the operative Second Superseding Indictment, such incorporation does not sufficiently put defendants on notice.

Therefore, the government must set forth allegations that define
when defendants ceased acting in furtherance of a mere agreement
and when and how each defendant joined or began actively
providing for the alleged military expedition or enterprise at
the core of this charge.  In short, the government must allege
when the alleged military expedition or enterprise began.  The
Second Superseding Indictment does not contain such allegations.

Therefore, defendants' Motion to Dismiss Count Five of the
Second Superseding Indictment is GRANTED.

**2.    Count One:    18 U.S.C. § 371 - Conspiracy to: Violate
the Neutrality Act, 18 U.S.C. § 960,
Receive, Possess and Transfer Machine
Guns and Destructive Devices, 18 U.S.C.
§ 922(o), 26 U.S.C. § 5861, and Export
Listed Defense Items Without a State
Department License, 22 U.S.C. § 2778**

Defendants move to dismiss Count One on the basis that the
conspiracy charge fails to allege an agreement to commit a crime.
Specifically, defendants contend that the Second Superseding
Indictment does not sufficiently allege conduct undertaken in the
United States, which the statutes at issue require.[13]

"An indictment charging a conspiracy under 18 U.S.C. § 371
should allege an agreement, the unlawful object toward which the
agreement is directed, and an overt act in furtherance of the
conspiracy." United States v. Lane, 765 F.2d 1376, 1380 (9th
Cir. 1985). "Since conspiracy is the gist of the crime, the

_____

[13]    In its opposition to defendants' motions to dismiss
Counts One and Four, the government argues, at length, that the
court has jurisdiction over the underlying alleged violations.
However, defendants do not move to dismiss on the basis that the
court does not have jurisdiction over the violations; rather,
they assert that no underlying violation has been alleged.
Accordingly, the court does not address the merits of the
government's jurisdictional arguments.

indictment need not state the object of the conspiracy with the detail that would be required in an indictment for committing the substantive offense." Id. However, "a person cannot conspire to commit a crime against the United States when the facts reveal there could be no violation of the statute under which the conspiracy is charged." United States v. Galardi, 476 F.2d 1072, 1079 (9th Cir. 1973).

### a. Conspiracy to Violate the Neutrality Act

As set forth above, the Neutrality Act may be violated by beginning a military expedition, setting on foot a military expedition, providing the means of a military enterprise, or procuring those means. Lumsden, 26 F. Cas. at 1015. The terms of the statute imply that the military expedition or enterprise "originate within the limits of the United States, and are to be carried on from this country." Trumbull, 48 F. at 103.

While as previously noted, the allegations relating to substantive violations of the Neutrality Act are insufficient to put each defendant on notice of the charges against him, the conspiracy charges do not suffer from such a deficiency. As set forth above, the allegations in the Second Superseding Indictment fail to set forth the military enterprise or expedition at the core of Count Five and fail to apprise each defendant of the conduct that allegedly violated the Act. However, the existence of such a military enterprise or expedition and a defendant's conduct in relation thereto is not at issue in Count One. Rather, the sole issue is whether all defendants agreed to begin or provide/prepare the means for such an enterprise or expedition.

1   The allegations in the Second Superseding Indictment
2   sufficiently allege an agreement to violate the Neutrality Act
3   and overt acts in furtherance of that agreement.  Under the
4   "Manner and Means" allegations, the Second Superseding Indictment
5   provides that defendants "during formal and informal meetings and
6   conversations, discussed the acquisition and transfer of military
7   arms, munitions, materiel, personnel, and money from the United
8   States to insurgents in Laos to conduct armed operations against
9   the government of Laos and to attempt to overthrow the government
10  of Laos."  (Second Superseding Indictment ¶ 23a.)  More
11  specifically, under the "Overt Acts" allegations, the Second
12  Superseding Indictment enumerates various meetings, during which
13  weapons were inspected and military strategy was discussed.  (Id.
14  ¶ 24.)  For example, the Second Superseding Indictment alleges
15  that on February 7, 2007, defendants Harrison Jack, Lo Cha Thao,
16  Lo, Thao, Seng Vue, Chue Lo, and Hue Vang met with the undercover
17  agent at a Sacramento restaurant to inspect "military arms,
18  munitions, and materiel," to discuss "capabilities and
19  acquisition of various military arms, munitions, and materiel,"
20  and to show on maps "locations purported to be Lao government
21  military positions and insurgent forces positions."  (Id. ¶ 24d.)
22  Similarly, on April 18, 2007, defendants Harrison Jack, Lo Cha
23  Thao, Lo Thao, Chong Yang Thao, Chue Lo, and Hue Vang[14] met with
24  the undercover agent at a Sacramento hotel, during which they
25  inspected five AK-47 machine guns.  (Id. ¶ 24p.)

26
27  _____

28       [14]  The Second Superseding Indictment alleges that Colonel
     Youa True Vang was also at both of these meetings.

1     The Second Superseding Indictment also alleges that in or

2 about February 2007 and May 2007, defendant David Vang "prepared

3 a document titled 'OPERATION POPCORN, A Comprehensive Plan of

4 Action, Coup Operation'"; "POPCORN was an acronym for 'Political

5 Opposition Party's Coup Operation to Rescue the Nation.'"   (<u>Id.</u> ¶

6 24f.)  Further, on or about April 13, 2007, defendants Harrison

7 Jack, Jerry Yang, Thomas Yang, Nhia Kao Vang, and Lo Cha Thao

8 allegedly met, established, and became members of the Hmong

9 Homeland Supreme Council, whose purpose was "to acquire funding

10 for and support insurgent military operations."   (<u>Id.</u> ¶¶ 24k,

11 24m.)  Subsequently, on May 7, 2007, defendant Lo Cha Thao told

12 defendant Harrison Jack that he wanted to place an order for AK-

13 47 machine guns and ammunition, which was relayed to the

14 undercover agent on the same day.  (<u>Id.</u> ¶¶ 24u-v.)

15     The allegations in the Second Superceding Indictment

16 sufficiently allege an agreement to violate the Neutrality Act

17 and set forth, at least minimally, each defendant's participation

18 in the alleged conspiracy.  Further, all discussions,

19 negotiations, and planning in furtherance of the conspiracy took

20 place in the United States.  Indeed, the allegations in the

21 Second Superseding Indictment indicate that defendants intended

22 that the money to support any military expedition or enterprise

23 was to come from the United States.

24     Therefore, defendants' motion to dismiss Count One to the

25 extent it charges a conspiracy to violate the Neutrality Act is

26 DENIED.

27

28

1           **b.   Conspiracy to Violate 18 U.S.C. § 922(o)**

2           18 U.S.C. § 922(o) provides that it is "unlawful for any

3   person to transfer or possess a machinegun."  The statute is

4   silent regarding whether the transfer of possession must occur in

5   the United States.

6           The Supreme Court has held that, in interpreting the

7   extraterritorial application of a statute, courts should start

8   with "the commonsense notion that Congress generally legislates

9   with domestic concerns in mind."  Small v. United States, 544

10  U.S. 385, 388 (2005) (quoting Smith v. United States, 507 U.S.

11  197, 204 n.5 (1993)).  The Court has also adopted "the legal

12  presumption that Congress ordinarily intends its statutes to have

13  domestic, not extraterritorial, application."  Id. at 388-89;

14  United States v. Lopez-Vanegas, 493 F.3d 1305, 1311 (11th Cir.

15  2007) ("A silent statute is presumed to apply only

16  domestically.").  Statutes may only be given extraterritorial

17  application "if the nature of the law permits it _and_ Congress

18  intends it."  Lopez-Vanegas, 493 F.3d at 1311 (emphasis in

19  original) (citing United States v. Baker, 609 F.2d 134, 136 (5th

20  Cir. 1980)).

21          "Absent an express intention on the face of the statute to

22  do so, the exercise of that power may be inferred from the nature

23  of the offenses and Congress' other legislative efforts to

24  eliminate the type of crime involved."  Baker, 609 F.3d at 136.

25  A court may infer extraterritorial intent from the nature of the

26  offense proscribed by the statute.  United States v. Bowman, 260

27  U.S. 94, 98 (1922) (holding that the offense of presenting a

28  false claim to the government extends to such frauds when

25

committed on vessels of the United States on the high seas or
when committed by American citizens on foreign ports).  "Where
'[t]he *locus* of the conduct is not relevant to the end sought by
the enactment' of the statute, and the statute prohibits conduct
that obstructs the functioning of the United States government,
it is reasonable to infer congressional intent to reach crimes
committed abroad."  United States v. Vasquez-Velasco, 15 F.3d
833, 839 (quoting United States v. Cotten, 471 F.2d 744, 751 (9th
Cir. 1973) (statute that proscribes theft of government property
is not logically dependent on the locality of violation for
jurisdiction) (emphasis in original); see also United States v.
Felix-Gutierrez, 940 F.2d 1200, 1204 (9th Cir. 1991) (holding
that limiting the jurisdiction of drug smuggling statutes to
activities that occur within the United States would severely
undermine their scope and effective operation because "drug
smuggling by its very nature involves foreign countries, and . .
. the accomplishment of the crime always requires some action in
a foreign country.").

However, "courts must resolve restrictively any doubts
concerning the extraterritorial application of a statute."  ARC
Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1097 (9th Cir.
2005).

If the object of a conspiracy is not a violation of the
substantive offense due to the lack of domestic conduct or
extraterritorial application of the statute at issue, there can
be no criminal conspiracy.  Lopez-Vanegas, 493 F.3d at 1311.  In
Lopez-Vanegas, two defendants appealed their conviction for
conspiracy to possess with intent to distribute cocaine in

violation of 18 U.S.C. §§ 841 and 846.  The defendants actively
helped broker a deal between a cocaine lord in Columbia and a
Saudi Arabian prince to transport substantial amounts of cocaine
by airplane from Caracas, Venezuela to Paris, France.  Both
defendants were present at multiple planning meetings held in
Miami, Florida.  Subsequently, a large quantity of cocaine was
successfully transported from Venezuela to France.  Id. at 1307-
11.  In obtaining convictions, the government relied solely on
the domestic conspiratorial conduct of the defendants to support
its assertion that a crime had been committed.  Id. at 1309 n.6.
The Eleventh Circuit reversed the convictions, holding that
discussions in the United States about criminal conduct that was
to occur wholly outside the United States was insufficient to
establish criminal liability under §§ 841 and 846.  The court
reasoned that there must be some other nexus to the United States
to allow for extraterritorial application of the statutes –
either possession within the United States or the intention to
distribute in the United States.  Id. at 1312; cf. United States
v. MacAllister, 160 F.3d 1304 (11th Cir. 1998) (upholding a
criminal conviction for a cocaine distribution conspiracy where
the cocaine was to be transported from Florida to Canada and
defendant had "proposed placing the cocaine on wooden crates that
would be loaded into the tractor-trailer in Jacksonville, Florida
and then delivered unopened to Montreal"); United States v.
Holler, 411 F.3d 1061, 1063-64, 1065 (9th Cir. 2005) (upholding
criminal convictions of 18 U.S.C. §§ 841(a) and 846 where
defendant had inspected the cocaine that he was to purchase in
Los Angeles, California); United States v. Daniels, No. C. 09-

00862, 2010 WL 2557506 (N.D. Cal. June 21, 2010) (denying defendants' motion to dismiss the indictment where they were charged with extortion, a greater part of the offense occurred within the United States, and the effects were intended to be felt in the United States).

Due to the statute's silence on the issue of extraterritorial application, § 922(o) is presumed to apply only domestically.  Further, the statutory context of subsection (o) relative to § 922 as a whole further supports domestic application.  For example, § 922(a)(1)(A) explicitly regulates firearms activity in "foreign commerce":

> It shall be unlawful . . . for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or *foreign commerce*.

(Emphasis added).  Similarly, subsections (a)(1)(B), (a)(2), (a)(4), (c)(1), (e), (f)(1), (f)(2), (g), (h)(1), (h)(2), (i), (j), (k), (n), (q)(2)(A), (q)(3)(A), and (u) *expressly proscribe* conduct in "foreign commerce."  Moreover, the Arms Export Control Act makes it unlawful to willfully export defense articles listed on the United States Munitions List, which includes machineguns. 22 U.S.C. §§ 2778(b)(2), (c); see also 22 C.F.R. § 120.17(a)(1) (defining "exporting" to mean "[s]ending or taking a defense article out of the United States in any manner . . . ."); 22 C.F.R. § 121.1 (listing "[f]ully automatic firearms to .50 caliber inclusive" on the United States Munitions List).[15]  As

---

[15]    In discussing the introduction of § 922(o), Senator Durenberger stated that the subsection was "intended to regulate

28

such, Congress has shown it is capable of addressing acts involving firearms outside of the United States. However, § 922(o) does not include such a provision. Accordingly, the doctrine of *expressio unius est exclusio alterius*[16] supports the conclusion that § 922(o) does not apply extraterritorially. See Lopez-Vanegas, 493 F.3d at 1313.

In this case, the allegations in the Second Superseding Indictment fail to sufficiently allege facts to support a violation of § 922(o), and thus, fail to sufficiently allege a conspiracy to violate the same. First, there are no allegations in the Second Superseding Indictment that any defendants possessed a machine gun in the United States. Second, there are no allegations that any of the defendants conspired to transfer a machinegun in interstate commerce. See United States v. Cummings, 281 F.3d 1046, 1050 (9th Cir. 2002) (noting that § 922(o) is an "attempt to prohibit the *interstate* transportation of a commodity through the channels of commerce") (internal quotations omitted) (emphasis added); United States v. Rambo, 74 F.3d 948, 952 (9th Cir. 1996) ("By regulating the market in machineguns, including regulating machinegun possession, Congress has effectively regulated the *interstate trafficking* in machineguns.") (emphasis added). Further, even if § 922(o) may

---

the ownership and use of machineguns *within the United States*," and specifically reference the Arms Export Control Act in limiting the scope of the section to domestic crime. 132 Cong. Rec. S5358-04 (May 6, 1986) (statement of Sen. Durenberger) (emphasis added).

[16] This doctrine is defined as "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." BLACK'S LAW DICTIONARY (9th ed. 2009).

apply extraterritorially in certain circumstances, the Second Superseding Indictment fails to allege a sufficient factual nexus to the United States to support such a conclusion in this case. See Lopez-Vanegas, 493 F.3d at 1313 (holding that even though §§ 841 and 846 had been applied extraterritorially in certain circumstances, such application was not appropriate where both possession and distribution was to occur outside of the United States).

Therefore, defendants' motion to dismiss Count One to the extent it charges a conspiracy to violate 18 U.S.C. § 922(o) is GRANTED.

### c.   Conspiracy to Violate 26 U.S.C. § 5861

26 U.S.C. § 5861 makes it unlawful "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record" or "to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required." 26 U.S.C. §§ 5861(d), (j). Section 5861(b) also prohibits the receipt or possession of a firearm transferred "in violation of the provisions of this chapter." The "provisions" referred to are set forth in 26 U.S.C. § 5812, which provides registration requirements for the transfer of firearms:

> (a) Application. A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except

that, if such person is an individual, the
identification must include his fingerprints and
his photograph; (4) the transferor of the firearm
is identified in the application form in such
manner as the Secretary may by regulations
prescribe; (5) the firearm is identified in the
application form in such manner as the Secretary
may by regulations prescribe; and (6) the
application form shows that the Secretary has
approved the transfer and the registration of the
firearm to the transferee.  Applications shall be
denied if the transfer, receipt, or possession of
the firearm would place the transferee in
violation of law.

(b)   Transfer of possession.  The transferee of a
firearm shall not take possession of the firearm
unless the Secretary has approved the transfer and
registration of the firearm to the transferee as
required by subsection (a) of this section.

26 U.S.C. § 5812.[17]

Similar to 18 U.S.C. § 922(o), 26 U.S.C. §§ 5812 and 5861
are silent regarding whether they apply extraterritorially.  As
such, the same presumption against such application applies.
Indeed, defendants present authority to support their assertion
that Congress was legislating with domestic concerns in mind.
See, e.g., H.R. Rep. No. 90-1577, *reprinted in* 1968
U.S.C.C.A.A.N. 4412 ("[The] increasing rate of crime and
lawlessness and the growing use of firearms in violent crime
clearly attest to a need to strengthen Federal regulation of
*interstate* firearms traffic.") (emphasis added); id. at 4413
("The subject legislation responds to widespread *national concern*
that existing Federal control over the sale and shipment of

_____

[17]    Title 26 U.S.C. § 7801(a)(2)(A)(i) provides:  "The
administration and enforcement of [26 U.S.C.S. §§ 5801 et seq.]
shall be performed by or under the supervision of the Attorney
General; and the term "Secretary" or "Secretary of the Treasury"
shall, when applied to those provisions, mean the Attorney
General . . . ."

firearms [across] *State* lines is grossly inadequate.") (emphasis added); id. ("H.R. 17735, as amended, is designed effectively to control the indiscriminate flow of such weapons *across State borders* and to assist and encourage *States and local communities* to adopt and enforce stricter gun control laws.") (emphasis added).

Conversely, the government fails to set forth any support for their assertion that §§ 5812 and 5861 apply extraterritorially, except for the contention that registration and regulation of firearms would be more effective if the statutes were given broader application.  However, such a bare assertion is insufficient for the court to conclude that the sections at issue apply extraterritorially.  The court notes that it may infer extraterritorial intent from the nature of the offense proscribed by the statute.  Vasquez-Velasco, 15 F.3d at 839 (holding that statute proscribing the commission of violent crimes in aid of a racketeering enterprise applied extraterritorially where the defendant was convicted of the kidnaping and murders of of an American DEA agent and a DEA informant).  However, unlike a statute proscribing fraud on the United States government, drug smuggling, or violent crimes against an American government agent, the receipt or possession of firearms that have not been properly registered in the National Firearms Registration and Transfer Record or by the Attorney General implicates a statute that is inherently domestic in nature.  Cf. Bowman, 260 U.S. 94; Felix-Gutierrez, 940 F.2d 1200; Vasquez-Velasco, 15 F.3d 833.  By its terms, it requires registration in a *national* record or approval of the *United*

*States* Attorney General.  As such, the *locus* of the conduct is relevant to the ends sought by the statute.

Moreover, in this case, based upon the allegations in the Second Superseding Indictment, the receipt and possession of the firearms at issue was contemplated to take place not in the United States, but in a foreign country.  Similar to the court's analysis of § 922(o), even if §§ 5812 and 5861 may apply extraterritorially in certain circumstances, the Second Superseding Indictment fails to allege a sufficient factual nexus to the United States to support such a conclusion in this case. See Lopez-Vanegas, 493 F.3d at 1313.

Therefore, defendants' motion to dismiss Count One to the extent it charges a conspiracy to violate 26 U.S.C. § 5861 is GRANTED.

### d.   Conspiracy to Violate 22 U.S.C. § 2778

22 U.S.C. § 2778 requires a license to import or export any "defense articles or defense services."  Specifically, it criminalizes the willful violation of any provision of § 2778, § 2779, or any rule or regulation issued under those sections.  22 U.S.C. § 2778(c).  The term "export" as used in § 2778 is defined in the federal regulations and means "[s]ending or taking a defense article out of the United States in any manner . . . ." 22 C.F.R. § 120.17(a)(1).  The Ninth Circuit has interpreted the term "'willfully' in section 2778(c) to mean that the government must prove that a defendant acted with specific intent, *i.e.*, knew that it was illegal to export the defense articles without a license."  United States v. Jerez, 935 F.2d 276 (9th Cir. 1991); see United States v. Lee, 183 F.3d 1029, 1032-33 (9th Cir. 1999)

1   (noting that § 2778 contains a scienter requirement that

2   "protects the innocent exporter who might accidentally and

3   unknowingly export a proscribed component or part").

4        Unlike 18 U.S.C. § 922(o) and 26 U.S.C. § 5861, 22 U.S.C. §

5   2778 expressly criminalizes willful conduct that either

6   originates in or is directed at a foreign country.  Where the

7   government charges a conspiracy to violate § 2778 by the export

8   of defense articles, the Second Superseding Indictment must

9   allege an agreement to send or take such defense articles *out* of

10  the United States.  See 22 C.F.R. § 120.17.

11       In this case the Second Superseding Indictment fails to

12  include sufficient factual allegations to support the general

13  assertion that defense articles were being exported from the

14  United States to Laos, via Thailand.  In the general "Conspiracy"

15  and "Manner and Means" allegations, the Second Superseding

16  Indictment provides that defendants conspired to transfer

17  "military arms, munitions, materiel, personnel, and money from

18  the United States to insurgents in Laos." (Second Superseding

19  Indictment ¶ 23a; see id. ¶¶ 22f, 23k.)  The only references to

20  any particular defendants are set forth in ¶¶ 23h and 23k of the

21  Second Superseding Indictment.  Paragraph 23h provides that

22  defendants Harrison Jack, Lo Cha Thao, Lo Thao, Chue Lo, Seng

23  Vue, Chong Yang Tao, Nhia Kao Vang, Hue Vang, and Jerry Yang[18]

24  "engaged in discussions and negotiations" with the undercover

25  agent "regarding the purchase of military arms, ammunition, and

26  materiel from the United States for delivery to Lao insurgents."

27

28       [18]   Colonel Youa True Vang is also alleged to have engaged
    in these discussions and negotiations.

1  (Second Superseding Indictment ¶ 23h.)   Paragraph 23k provides

2  that defendants Harrison Jack, Lo Cha Thao, Lo Thao, and Chong

3  Yang Thao "made arrangements for the first order of arms,

4  munitions, and materiel to be delivered from the United States to

5  a remote location in Thailand on June 12, 2007."  (Id. ¶ 23k.)

6       However, despite recounting approximately 38 phone calls,

7  meetings, and negotiations in the "Overt Acts" section, the

8  Second Superseding Indictment never reveals (1) when any such

9  "negotiations," "discussions," or "arrangements" took place; or

10 (2) which defendants participated in these specific

11 "negotiations," "discussions," or "arrangements."  For example,

12 it is unclear if or whether the defendants referred to in ¶¶ 23h

13 and 23k met with the undercover agent individually, collectively,

14 or in some combination.  It is similarly unclear if or whether

15 the "negotiations," "discussions," or "arrangements" took place

16 in a single meeting or over a series of meetings.  Finally, it is

17 unclear whether the defendants not identified in ¶¶ 23h or 23k

18 were ever aware of the "negotiations," "discussions," or

19 "arrangements" to export "defense articles."

20      Given the unusual complexity of the charges and their

21 diverse factual underpinnings, the court concludes that general

22 allegations of "discussions," "negotiations," or "arrangements"

23 regarding the export of "defense articles" from the United States

24 do not adequately enable each defendant to prepare his defense.

25 Export is an essential factual element of the underlying object

26 of the alleged conspiracy.  See MacAllister, 160 F.3d at 1306 &

27 n.1.  Due to the lack of specificity in the factual allegations,

28 it is unclear whether all eleven defendants ever agreed to

willfully export defense articles from the United States and, if so, when such agreement took place.[19]

The court also notes the unique nature of the allegations in the complaint arising from the type of contraband at issue and the role of the undercover agent in the investigation.  While firearms and munitions were shown to defendants at weapon "flashes" in Sacramento, California, there are no allegations that these were, in fact, the firearms that defendants were to purchase.  Cf. Holler, 411 F.3d at 1063-64.  Indeed, the allegations do not reflect the vast number of firearms and explosives that defendants allegedly intended to purchase according to the Second Superseding Indictment.  Furthermore, the allegations do not demonstrate that there were any firearms that would ever be purchased or transported.  Accordingly, the Second Superseding Indictment is addressing charges that relate to firearms, explosives, and ammunition that never existed.  Thus, because the nexus to the United States cannot be ascertained from the existence of actual facts, the indictment must allege that

---

[19]   Furthermore, the court finds the timing and content of the addition of the conclusory export allegations troubling.  The First Superseding Indictment, filed in 2009, over two years after the original Indictment, did not include allegations that any specific defendants planned for delivery of defense articles from the United States; rather, the allegations emphasized that delivery was to be in Thailand.  (First Superseding Indictment at 10-11.)  Almost a year later, after defendants pointed out the deficiency in their motions to dismiss, general, conclusory allegations were added without any reference to specific meetings, discussions, negotiations, or the specific defendants who were present.

each defendant knew that a nexus to the United States would exist.[20]

Therefore, defendants' motion to dismiss Count One to the extent it charges a conspiracy to violate 22 U.S.C. § 2778 is GRANTED.

### 3.   Count Four:     18 U.S.C. §§ 844(d), (n) - Conspiracy to Receive and Transport Explosives in Interstate and Foreign Commerce

18 U.S.C. § 844(d) provides in relevant part:

> Whoever transports or receives, or attempts to transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, shall be imprisoned for not more than ten years, or fined under this title, or both . . . .

The phrase "interstate or foreign commerce" is defined in 18 U.S.C. § 841(b), which provides in relevant part: "'Interstate' or foreign commerce means commerce between any place in a State and any place outside of that State . . . . 'State' includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone)." Accordingly, to set forth a violation of § 844(d), an indictment must allege that the transport or receipt (or

---

[20]   As set forth, *infra*, this unique notice problem similarly applies to the charges in Count Four.  The court also notes that the deficiencies relating to nexus likely apply to the conspiracies to violate 18 U.S.C. § 922(o) and 26 U.S.C. § 5861. However, as set forth above, these charges suffer from pleading defects separate and apart from this issue.

attempted transport or receipt) took place in the United
States.[21]

In this case, as set forth above in the court's discussion
of 22 U.S.C. § 2778, the allegations in the Second Superseding
Indictment are insufficient to enable each defendant to prepare
his defense.  Specifically, the Second Superseding Indictment
fails to allege whether any or all eleven defendants agreed to
transport explosives from the United States and when they did so,
an essential element of the offense.

Accordingly, defendants' motion to dismiss Count Four of the
Second Superseding Indictment is GRANTED.

**B.   Multiplicitous Counts**

All defendants move to compel election between
multiplicitous counts.  Defendants contend that because Counts
One and Two penalize the same conduct, the court should exercise
its discretion to compel the government to choose between the
charges.[22]  Specifically, defendants contend that the alleged
conspiracy to violate the Neutrality Act in Count One is the same

---

[21]    18 U.S.C. § 844(n) sets forth the statutory penalties
for a conspiracy to commit a violation of the section.

[22]    Defendants also sought to compel election between
Counts Three and Four.  Because, as set forth above, Count Four
has been dismissed, the court does not address this aspect of the
motion in detail.  However, the court notes that it appears from
a plain reading of the relevant statutes that Counts Three and
Four are not multiplicitous.  Defendants concede that Count Four
requires proof of an element that need not be established in
Count Three.  (Defs.' Mot. to Compel Election [Docket #544],
filed May 19, 2010, at 4.)  Similarly, Count Three requires proof
of an element that need not be established in Count Four, namely
the existence of an explosive, "guided by any system . . . to
seek or proceed toward energy radiated or reflected from an
aircraft or toward an image locating an aircraft; or otherwise
direct or guide the rocket or missile to an aircraft."  18 U.S.C.
§ 2332g.

crime as the alleged conspiracy to kill and maim people, and to damage property in a foreign county in Count Two.

The Fifth Amendment's Double Jeopardy Clause prohibits both successive prosecutions for the same offense after acquittal or conviction and multiple criminal punishments for the same offense.  See Monge v. California, 524 U.S. 721, 727-28 (1998). "When a defendant has violated two different criminal statutes, the double jeopardy prohibition is implicated when both statutes prohibit the same offense or when one offense is a lesser included offense of the other." United States v. Davenport, 519 F.3d 940, 943 (9th Cir. 2008) (citing Rutledge v. United States, 517 U.S. 292, 297 (1996)).  "If two different criminal statutory provisions indeed punish the same offense or one is a lesser included offense of the other, then conviction under both is presumed to violate congressional intent." Id. (citing Missouri v. Hunter, 459 U.S. 359, 366-67 (1983)).

In Blockburger v. United States, 284 U.S. 299 (1932), the Supreme Court set forth the test to determine whether two statutory provisions prohibit the same or a lesser included offense.  The Blockburger test provides, "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Id. at 304.  This analysis "focuses on the statutory elements of the offenses, not the actual evidence presented at trial." United States v. Overton, 573 F.3d 679, 691 (9th Cir. 2009).

A plain reading of the statutes at issue, 18 U.S.C. §§ 960 and 956, demonstrates that Counts One and Two are not multiplicitous.  As set forth above, the Neutrality Act criminalizes (1) the beginning of a military expedition, (2) the "setting on foot" of a military expedition, (3) the provision of the means of a military enterprise, and (4) the procurement of those means.  Lumsden, 26 F. Cas. at 1015.  It also requires the existence of a military expedition or enterprise that is to be carried on from the United States.  See id.  On the other hand, § 956 requires proof that individuals conspired to (1) murder, kidnap, or maim in a foreign country; or (2) "damage or destroy specific property situated within a foreign country and belonging to a foreign government . . . ."  18 U.S.C. § 956.  Count One requires proof of an element that Count Two does not, namely the existence of a military expedition or enterprise.  Similarly Count Two requires proof of an element that Count One does not, namely the act of murder, kidnapping or maiming or the damage or destruction of specific property.[23]  Therefore, Counts One and Two do not charge the same offense or a lesser included offense.

Therefore, defendants' motion to compel election between multiplicitous counts is DENIED.

---

[23]   While defendants assert that "a military expedition or enterprise presupposes killing and maiming people and damaging property," history belies such a contention.  While violence and destruction most often accompanies military activity, a military enterprise or expedition may implicate a wide range of tactics, including intimidation by overwhelming show of force in order to extract surrender, that do not involve killing, kidnapping, maiming, or destruction of property.

**C.   Prosecutorial Misconduct**

Finally, all defendants move to dismiss Count Three on the basis of alleged prosecutorial misconduct before the Grand Jury. Specifically, defendants contend that the government intentionally misled the grand jury as to the state of the evidence in support of Count Three.

A defendant who challenges an indictment on the ground of prosecutorial misconduct bears the burden of demonstrating that the prosecutor engaged in flagrant misconduct deceiving the grand jury or significantly impairing its exercise of independent, unbiased judgment. United States v. DeRosa, 783 F.2d 1401, 1405-06 (9th Cir. 1986); United States v. Polizzi, 500 F.2d 856, 887-88 (9th Cir. 1974) (noting that a defendant has a "difficult burden" in demonstrating "a reasonable inference of bias on the part of the grand jury resulting from the comments of the prosecutor"). Indeed, "courts have attached a presumption of regularity to grand jury proceedings . . . [i]n order to ensure that trials and not pretrial inquiries into the grand jury process resolve" challenges to the evidence presented to a grand jury. United States v. Claiborne, 765 F.2d 784, 791 (9th Cir. 1985), *abrogated on other grounds by* Ross v. Oklahoma, 487 U.S. 81 (1988). "The facts of each case determine when Government conduct has placed in jeopardy the integrity of the criminal justice system." DeRosa, 783 F.2d at 1406 (quoting United States v. Samango, 607 F.2d 877, 884 (9th Cir. 1979)).

Defendants may establish grand jury abuse sufficient to dismiss an indictment "by demonstrating that the prosecutor obtained an indictment by knowingly submitting perjured testimony

to the grand jury." <u>Claiborne</u>, 765 F.2d at 791.  Such conduct

can be characterized as so "arbitrary and capricious" to violate

due process or worthy of condemnation by the courts' supervisory

powers.  <u>Id.</u> (citing <u>United States v. Al Mudarris</u>, 695 F.2d 1182,

1185 (9th Cir. 1983).  Perjury occurs when "[a] witness

testifying under oath or affirmation . . . gives false testimony

concerning a material matter with the willful intent to provide

false testimony." <u>United States v. Reed</u>, 147 F.3d 1178 (9th Cir.

1998)(citing <u>United States v. Dunnigan</u>, 507 U.S. 87, 94 (1993);

18 U.S.C. § 1621(1)).

However, in order to justify dismissal of an indictment, the

perjury must be material.  <u>United States v. Bracy</u>, 566 F.2d 649,

655 (9th Cir. 1977).  Material perjury is defined as "evidence

that creates a reasonable doubt with respect to defendant's guilt

that did not otherwise exist." <u>Id.</u> at 656.  The materiality of

perjured testimony should not be presumed, and mere speculation

cannot justify a court's intervention into the grand jury's

proceedings.  <u>United States v. Claiborne</u>, 765 F.2d at 791-92.





Therefore, defendants' motion to dismiss Count Three for prosecutorial misconduct is DENIED.

**CONCLUSION**

For the foregoing reasons, defendants' motions to dismiss are GRANTED in part and DENIED in part.  Specifically,

(1)   Defendants' Motion to Dismiss Count Five of the Second Superseding Indictment is GRANTED;

(2)   Defendants' motion to dismiss Count One of the Second Superseding Indictment to the extent it charges a conspiracy to violate the Neutrality Act is DENIED;

(3)   Defendants' motion to dismiss Count One of the Second Superseding Indictment to the extent it charges a conspiracy to violate 18 U.S.C. § 922(o) is GRANTED;

(4)   Defendants' motion to dismiss Count One of the Second Superseding Indictment to the extent it charges a conspiracy to violate 26 U.S.C. § 5861 is GRANTED;

(5)   Defendants' motion to dismiss Count One to the extent it charges a conspiracy to violate 22 U.S.C. § 2778 is GRANTED;

(6)   Defendants' motion to dismiss Count Four of the Second Superseding Indictment is GRANTED;

(7)   Defendants' motion to compel election between multiplicitous counts is DENIED; and

(8)   Defendants' motion to dismiss Count Three for prosecutorial misconduct is DENIED.

IT IS SO ORDERED.

Dated: November 12, 2010

_____
FRANK C. DAMRELL, JR.
United States District Judge

44